**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2021-NMSC-021**

**Filing Date: May 27, 2021**

**No. S-1-SC-37729**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**DAVON LYMON,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Neil C. Candelaria, District Judge**

Released for Publication June 29, 2021.

Harrison & Hart, LLC
Nicholas Thomas Hart
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
John J. Woykovsky, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**BACON, Justice.**

**{1}** Defendant Davon Lymon shot Albuquerque Police Department (APD) Officer Daniel Webster six times during a traffic stop in 2015. Defendant was charged with and convicted of first-degree murder, two counts of tampering with evidence related to first-degree murder, forgery, shooting from a vehicle resulting in great bodily harm, receiving or transferring a stolen vehicle, and resisting, evading, or obstructing an officer. The trial court later vacated his convictions for shooting from a vehicle and for one of the two tampering counts.

**{2}**     On direct appeal, Defendant raises challenges to the district court's final verdict, claiming jury coercion, improper denial of a self-defense instruction, improper admission and improper exclusion of evidence, and juror misconduct. Defendant also argues that these issues resulted in a cumulative error. Defendant's arguments are not persuasive, and we affirm Defendant's convictions.

## I.     BACKGROUND

**{3}**     Officer Webster pulled over Defendant and passenger Savannah Garcia in a Walgreens parking lot because Defendant appeared to be driving a stolen Honda motorcycle. After the motorcycle came to a stop, Officer Webster exited his vehicle with his weapon raised and pointed toward Defendant and Garcia. Officer Webster ordered Defendant and Garcia to raise their hands over their heads and approached the motorcycle. Defendant lowered his hands, although Garcia left hers above her head. During the encounter, Officer Webster stepped on Defendant's foot. Defendant asked why Officer Webster was stepping on his foot, and Officer Webster responded, "This is how I control you." Officer Webster holstered his weapon and attempted to handcuff Defendant. Officer Webster handcuffed Defendant's left hand, and then as Officer Webster tried to handcuff Defendant's right hand, Defendant appeared to experience pain in his shoulder.

**{4}**     Approximately forty-eight seconds after Officer Webster holstered his weapon, Defendant leaned away from Officer Webster, drew his own pistol with his right hand, and shot Officer Webster. Defendant fired the first four shots in rapid succession. The fifth and sixth shots were separated by more time and were fired as Officer Webster was running away and attempting to take cover. Defendant and Garcia then fled the scene separately.

**{5}**     After a thirteen-day trial, the jury deliberated and returned with its preliminary verdict. For Count 1, the jury found Defendant "not guilty" of first-degree murder but neither filled out a verdict form for a lesser-included offense of Count 1, second-degree murder or voluntary manslaughter, nor reported any disagreement to the trial court as the jury instructions directed. But the jury's findings for the special verdicts and other counts suggested that the jury found that Defendant was guilty of first-degree murder.

**{6}**     After the jury returned its preliminary verdict forms, the trial court told the parties, "[The jurors] turned the verdict forms over, but there's an inconsistency [with Count 1] and the court does not know what their verdict is based on what they have answered." The trial court noted, "It appears on all counts, [the jurors] found [Defendant] guilty, but what I'm concerned about is the special interrogatories indicate that he committed first-degree murder, but at the same time, they wrote on [the verdict form for Count 1] not guilty of first-degree murder. . . . And then [the jurors] did not fill out any of the other lesser-included offenses."

**{7}**     After discussing the inconsistency with the parties, the trial court decided to send a note asking the jury to clarify its verdict instead of polling the jury. The State had suggested polling the jury, but Defendant opposed it. The trial court decided not to poll

the jury "just yet." Instead, the trial court stated, "I need to send in a question, I believe, and I need to frame it in such a way that it doesn't influence them one way or another, but I need to find out [the verdict for Count 1]." Eventually, the trial court decided to send all of the verdict forms back to the jury with a question that stated, "What is your verdict as to Count 1?" Defendant objected to the phrasing, suggesting that the trial court phrase the question in a more neutral way and direct the jury to consider the lesser-included offenses.

**{8}** The jury subsequently returned the verdict forms for Count 1 with both the "not guilty" and "guilty" verdict forms for first-degree murder signed. The jury told the bailiff that the verdict form on top—the guilty verdict form—was the proper verdict form for Count 1. Defendant moved for a mistrial, which the trial court denied. The trial court then sent back to the jury new verdict forms, the jury instructions, and a second note stating, "You have signed both verdict forms as to Count 1. The Court has provided new verdict forms as to Count 1. Please indicate your verdict on these new forms as to Count 1."

**{9}** The jury returned the verdict forms a third time, finding Defendant guilty of first-degree murder. The trial court polled the jury, whereupon the jurors unanimously confirmed that the verdicts reflected their intent.

## II.   DISCUSSION

**{10}** The primary issue in this case is whether the trial court's conduct coerced the jury. After considering a trial court's authority to clarify an inconsistent and ambiguous preliminary verdict, we conclude that the trial court's conduct was not coercive. We also conclude that the trial court did not err when it denied a self-defense instruction, included and excluded certain evidence, and denied an evidentiary hearing based on Defendant's allegation of juror misconduct.

### A.   The District Court's Communication Clarified the Verdict and Was Not Coercive

**{11}** Defendant contends that the trial court committed a reversible error when it did not accept the preliminary verdicts, including the "not guilty" verdict for first-degree murder. He suggests that the trial court coerced the jury by inquiring into the inconsistent preliminary verdict for Count 1. As we explain below, the trial court did not coerce the jury or abuse its discretion when it sought to clarify the jury's inconsistent verdict and denied Defendant's motion for a mistrial.

### 1.   Standard of review

**{12}** The trial court denied Defendant's motion for a mistrial after the jury returned both guilty and not guilty verdict forms for Count 1. "A denial of a motion for mistrial is reviewed under an abuse of discretion standard." *State v. Swick*, 2012-NMSC-018, ¶ 68, 279 P.3d 747 (internal quotation marks omitted) (quoting *State v. Johnson*, 2010-NMSC-016, ¶ 49, 148 N.M. 50, 229 P.3d 523). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case."

*Id.* ¶ 68 (internal quotation marks omitted) (quoting *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829). An abuse of discretion occurs when the trial court misapprehends or misapplies the law. *State v. Worley*, 2020-NMSC-021, ¶ 13, 476 P.3d 1212; *Murken v. Solv-Ex Corp.*, 2005-NMCA-137, ¶ 12, 138 N.M. 653, 124 P.3d 1192.

## 2. A trial court may clarify a jury's preliminary verdict before entering the final verdict

**{13}** A trial court has the authority to clarify a jury's preliminary verdict before entering a final verdict. *See State v. Aguilar*, 2019-NMSC-017, ¶¶ 52, 54, 451 P.3d 550. A preliminary verdict expressed by the jury's preliminary verdict forms is not, in fact, a final verdict. *See id.* ¶¶ 52, 54. This Court has described preliminary verdict forms and other indications of a jury's deliberations as "no more than an initial vote," *id.* ¶ 52, and "a snapshot of the jury's thinking partway through deliberations," *State v. Phillips*, 2017-NMSC-019, ¶ 18, 396 P.3d 153 (referring to a note sent from the jury to the trial court indicating a possible deadlock). "[A] verdict is not final until it is 'rendered by the jury in open court and accepted by the court.'" *Aguilar*, 2019-NMSC-017, ¶ 52 (quoting *Phillips*, 2017-NMSC-019, ¶ 18).

**{14}** A trial court is not compelled to accept a preliminary verdict. *See id.* ¶¶ 52, 54; *State v. Apodaca*, 1997-NMCA-051, ¶¶ 19-20, 123 N.M. 372, 940 P.2d 478. Neither is a trial court "empowered to refuse arbitrarily to accept a jury verdict." *Apodaca*, 1997-NMCA-051, ¶ 25. If the actual intent of the jury, as reflected in a preliminary verdict, appears ambiguous or inconsistent, it is within the trial court's authority to refuse to accept the preliminary verdict and seek to clarify the jury's intent. *See id.* ¶ 21 (citing *State v. Searles*, 155 A. 213, 216 (1931). "[T]he trial court is under a nondiscretionary duty to clarify any ambiguity in the jurors' responses and obtain a clear and unambiguous response from the jury . . . ." *Phillips*, 2017-NMSC-019, ¶ 14 (referring to a trial court's duties related to jury polls). Indeed, "[i]n any case upon the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt, for there is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination." *State v. Holloway*, 1987-NMCA-090, ¶ 18, 106 N.M. 161, 740 P.2d 711 (brackets omitted) (internal quotation marks omitted) (quoting *United States v. Morris*, 612 F.2d 483, 489 (10th Cir. 1979).

**{15}** Polling the jury under Rule 5-611(E) NMRA is one way to clarify a jury's intent when it presents the trial court with an ambiguous preliminary verdict. *See Apodaca*, 1997-NMCA-051, ¶ 23. While Rule 5-611(E) focuses on a jury's unanimity, New Mexico courts have also recognized the "'equally important needs for clarity and certainty as to the meaning of the verdict being reported.'" *Apodaca*, 1997-NMCA-051, ¶ 24 (quoting *United States v. Rastelli*, 870 F.2d 822, 835 (2d Cir. 1989) (relating a trial court's authority under Rule 31(d) of the Federal Rules of Criminal Procedure—which states the entirety of Rule 5-611(E)—when a jury's verdict is uncertain or ambiguous)). A trial court must poll the jury if any party requests it, or on its own motion, after the jury returns a preliminary verdict. Rule 5-611(E). If the poll lacks unanimity, then the trial court may direct the jury to continue deliberations. *Id.*

**{16}** A trial court may also communicate with the jury to clarify its intent and can utilize various methods to do so. *Phillips*, 2017-NMSC-019, ¶ 15 (describing different methods of "clarifying the jurors' ambiguous responses" that are available to the district court); *State v. Rickerson*, 1981-NMSC-036, ¶ 7, 95 N.M. 666, 625 P.2d 1183 (regarding a trial court's inquiry into the numerical division of the jurors' votes). "[A] judge not only can, but should, communicate with the jury and can do so if the communication leaves with the jury the discretion whether or not it should deliberate further." *State v. McCarter*, 1980-NMSC-003, ¶ 6, 93 N.M. 708, 604 P.2d 1242. The trial court has "significant discretion to undertake 'proper remedial measures' to clarify the jurors' ambiguous responses." *Phillips*, 2017-NMSC-019, ¶ 15 (quoting *Holloway*, 1987-NMCA-090, ¶ 17) (referring to the trial court's authority when polling the jury).

**{17}** In this case, the jury's preliminary verdict under Count 1 was inconsistent and ambiguous, and the trial court had both the authority and the duty to clarify the jury's intent before entering a final verdict. To resolve Count 1, the jury could enter a verdict that found Defendant guilty of first-degree murder, second-degree murder, or voluntary manslaughter or a verdict of not guilty of as many as all three charges. The jury was instructed to initially consider first-degree murder. If the jury unanimously found Defendant guilty of first-degree murder, it was to sign the "guilty" verdict form for first-degree murder and leave all of the other forms for Count 1 unsigned. If the jury unanimously found Defendant not guilty of first-degree murder, it was to sign the "not guilty" verdict form for first-degree murder and consider second-degree murder. In considering second-degree murder and then voluntary manslaughter, the jury was instructed to follow the same procedure. If the jury could not unanimously agree on the verdict, then the jury was to report the disagreement to the trial court and not sign any verdict forms.

**{18}** The jury's first preliminary verdict for Count 1 was inconsistent and ambiguous because it was incomplete. The jury signed the "not guilty" verdict form for first-degree murder but left all of the other verdict forms for Count 1 unsigned, contrary to the instructions. In addition, the jury did not report to the trial court that it was deadlocked or that it was unable to reach a determination on any of the charges presented. Thus, the trial court was left with a preliminary verdict that needed to be reconciled because the returned special verdict forms suggested that the jury found Defendant guilty of first-degree murder, a finding that conflicted with the "not guilty" verdict form the jury returned.

**{19}** The jury's second preliminary verdict was also inconsistent and ambiguous because the jury returned both "guilty" and "not guilty" verdict forms signed for Count 1. In contrast, the jury in *Aguilar* wrote the word "void" on the verdict forms that it had previously signed to indicate that it intended to retract those forms after the trial court inappropriately notified the jury of its ambiguous preliminary verdict. 2019-NMSC-017, ¶¶ 10-11. The jury here did not indicate on the verdict forms themselves its intent to abandon its signed "not guilty" verdict form for first-degree murder. Instead, the jury told the bailiff that the top verdict sheet—the "guilty" verdict—was correct. This left the trial court with two completely opposite verdict forms for Count 1 that it could not reconcile.

**{20}**  The trial court was not compelled to accept either the first or the second preliminary verdict and refusing to do so was not arbitrary. *See Apodaca*, 1997-NMCA-051, ¶ 25. Rather, in this instance, the trial court had a duty to resolve the doubt and ambiguity presented by the jury's preliminary verdicts for Count 1. *Holloway*, 1987-NMCA-090, ¶ 18. It was reasonable and within the trial court's authority to send the note that it did, seeking to clarify the jury's intent before entering a final verdict, and to provide new verdict forms to the jury.

### 3.  The method used by the district court to clarify the preliminary verdicts was not coercive

**{21}**  Having established that the trial court had the authority and duty to clarify the jury's intent before entering a final verdict, we turn now to the trial court's method of clarification and consider whether the trial court coerced or influenced the jury. The most appropriate course of action would have been to poll the jury after the jury returned its first preliminary verdict. In fact, the State requested that the jury be polled, per Rule 5-611(E). Despite this request, the trial court determined that it would not poll the jury "just yet" and decided to send the note to the jurors to clarify their verdict.

**{22}**  While the trial court has the authority to attempt to clarify the jury's preliminary verdict, it exceeds its authority if its actions influence or coerce the jury. *McCarter*, 1980-NMSC-003, ¶¶ 7-8; *see Holloway*, 1987-NMCA-090, ¶ 21 ("[T]he court's polling or questioning must also be carried out so as to avoid influencing or coercing a juror's verdict."). A trial court coerces a jury if it causes any jurors to "abandon their honest convictions." *See State v. Romero*, 2013-NMCA-101, ¶ 23, 311 P.3d 1205. If a trial court coerces the jury, then it violates the defendant's "right to a fair and impartial trial." *McCarter*, 1980-NMSC-003, ¶ 7. If a court does have a coercive effect on a jury, then it is a reversible error that requires a new trial. *State v. Juan*, 2010-NMSC-041, ¶ 19, 148 N.M. 747, 242 P.3d 314.

**{23}**  A trial court may have a coercive effect on a jury through the cumulative effect of its actions that depend on the circumstances from which they arise. *See State v. Laney*, 2003-NMCA-144, ¶ 56, 134 N.M. 648, 81 P.3d 591; *Juan*, 2010-NMSC-041, ¶¶ 18-19 (considering the day, time of day, and length of deliberations to conclude that the trial court's decision not to respond to the jury's question was coercive). A trial court coerces a jury when it tells or suggests to a jury that it *must* continue to deliberate because the trial court's input may pressure jurors to change their convictions. *McCarter*, 1980-NMSC-003, ¶ 6. The classic "shotgun" instruction often raises concerns regarding coercion. *Id.*

**{24}**  Defendant contends that the trial court's questions were akin to shotgun instructions rather "than a neutral inquiry into the status of the deliberations." Defendant, quoting *McCarter*, 1980-NMSC-003, ¶ 7, argues that the trial court's inquiry was coercive and violated his "right to a fair and impartial trial." Defendant suggests that the trial court should have provided clarifications similar to those considered by the Tenth Circuit in *United States v. Shippley*, 690 F.3d 1192, 1194-95 (10th Cir. 2012).

**{25}**    In *Shippley*, the jury returned an inconsistent verdict that effectively "convicted *and* acquitted [the defendant] of the charged conspiracy." *Id.* at 1193 (describing the inconsistency between returning a general verdict convicting the defendant of conspiracy to distribute but also returning responses to special interrogatories that "indicated [the defendant] had not conspired to distribute *any* of the drugs listed in the indictment"). The trial court asked the jury to deliberate again and read the jury a supplemental instruction. *Id.* The trial court brought the inconsistency in the verdict to the jury's attention stating, "[y]our ostensible verdict of guilty as to the crime of conspiracy as charged in Count One of the Indictment is inherently inconsistent with your answers to the Special Questions." *Id.* (alteration in original). The trial court then explained "that, if the jury wished to render a verdict of not guilty it should reconsider its answer in the general verdict form. . . . [I]f the jury wanted to render a guilty verdict it should reconsider its answers to the special interrogatories." *Id.* at 1193-94. After describing the inconsistency in the verdict, the trial court provided guardrails for the jury's continued deliberations. *Id.* The trial court emphasized that the jury could maintain its initial preliminary verdict and "that any changes must be unanimous." *Id.* at 1194. The trial court cautioned "that nothing [it] said was meant to 'intimate or indicate what I think your verdicts or answers should be. Those decisions are entirely up to you.'" *Id.* Soon after, the jury returned a consistent guilty verdict. *Id.*

**{26}**    The defendant in *Shippley* contended that the trial court's instruction was coercive. *Id.* at 1196-97. The Tenth Circuit, in an opinion written by now-Justice Gorsuch, disagreed. *Id.* at 1197. The Tenth Circuit recognized that some of the trial court's language could have been construed as coercive when viewed in isolation. *Id.* ("While it's true the [trial] court told the jury that its 'ostensible verdict' of guilty was 'inherently inconsistent' with the special verdict findings, and while one can argue whether the jury might have taken this language in isolation as a criticism and perhaps even coercive, the court didn't stop there.") However, the Tenth Circuit concluded that the trial court was not coercive because, after bringing the jury's attention to the inconsistency in its verdict, the trial court provided sufficient precautionary instructions to avoid any coercive influence on the jury. *Id.* In particular, the trial court assured the jury that the jury alone was the ultimate fact-finder and emphasized an intent not to affect the jury's verdict. *Id.*

**{27}**    Unlike *Shippley*, the trial court in this case did not bring attention to the jury's inconsistent verdict in a way that may have been considered criticism or coercion. Instead, aware that it could not influence or coerce the jury, the trial court here asked the jury a plain, clarifying question: "What is your verdict as to Count 1?" This question is the same question the trial court would have asked when polling the jury even if there had been no inconsistency. In light of the jury instructions, this question had the same effect as asking the jury to consider the lesser-included offenses under Count 1 as Defendant's counsel had suggested. Had the trial court brought the issue with the verdict's apparent inconsistency to the jury's attention, it would have needed to provide cautioning instructions as the *Shippley* Court did to ensure that the jury did not abandon its honest convictions due to the trial court's attempt to clarify the jury's intent. However, the trial court's first question to the jury did not suggest that the jury was required to continue its deliberation or pressure possible holdout jurors to conform, in part because

there was no indication that the jury was deadlocked. *See Rickerson*, 1981-NMSC-036, ¶ 4. The trial court's second question was similarly neutral, especially in light of the jury's communication with the bailiff indicating that the guilty verdict form for Count 1 was the correct verdict form.

**{28}** Under the circumstances, the trial court had a duty to clarify the jury's intent, given the inconsistency of Count 1, and it endeavored to ask a question that would not have an effect on the jury's honest convictions. We would have preferred that the trial court had polled the jury following the return of the first preliminary verdict forms per Rule 5-611(E). However, we conclude that the trial court did not abuse its discretion and did not coerce the jury when it issued the two notes to the jury.

**B.      Self-Defense Instruction**

**1.      Standard of review**

**{29}** Defendant argues that the trial court erred in refusing to give a self-defense instruction. We review de novo whether a trial court properly refused a defendant's tendered jury instruction because the question "is closer to a determination of law than a determination of fact." *State v. Ellis*, 2008-NMSC-032, ¶ 14, 144 N.M. 253, 186 P.3d 245 (quoting *State v. Lucero*, 1998-NMSC-044, ¶ 5, 126 N.M. 552, 972 P.2d 1143). "We view the evidence in the light most favorable to the giving of the requested instruction." *State v. Hill*, 2001-NMCA-094, ¶ 5, 131 N.M. 195, 34 P.3d 139. "[W]hen there is contradictory testimony, we rely on [the d]efendant's version of the events." *Ellis*, 2008-NMSC-032, ¶ 2. When the evidence supports giving an instruction, then failure to provide the instruction is a reversible error. *State v. Jones*, 2020-NMCA-029, ¶ 8, 464 P.3d 1079 (citing *State v. Brown*, 1996-NMSC-073, ¶ 34, 122 N.M. 724, 931 P.2d 69).

**2.      A self-defense instruction here requires excessive force**

**{30}** "In New Mexico, a person has a limited right of self-defense against a police officer using excessive force." *Id.* ¶ 7 (citing *State v. Kraul*, 1977-NMCA-032, ¶ 29, 90 N.M. 314, 563 P.2d 108). This right to assert self-defense against a police officer is qualified "because police officers have a duty to make arrests and a right to use reasonable force when necessary." *Ellis*, 2008-NMSC-032, ¶ 15. A person "does not have the right to self-defense when the officer is using necessary force to effect an arrest." *Kraul*, 1977-NMCA-032, ¶ 29. A person is entitled "to assert self-defense only when the officer is using excessive force." *Ellis*, 2008-NMSC-032, ¶ 16.

**{31}** Defendants are entitled to a self-defense instruction "'whenever [they present] evidence sufficient to allow reasonable minds to differ as to all elements of the defense.'" *Id.* ¶ 15 (quoting *State v. Lopez*, 2000-NMSC-003, ¶ 23, 128 N.M. 410, 993 P.2d 727). For a self-defense instruction, a defendant must present evidence of "'fear by an apparent danger of immediate death or great bodily harm, that the killing resulted from that fear, and that the defendant acted as a reasonable person would act under those circumstances.'" *Lopez*, 2000-NMSC-003, ¶ 23 (quoting *State v. Branchal*, 1984-NMCA-063, ¶ 5, 101 N.M. 498, 684 P.2d 1163). A jury instruction for self-defense

against a police officer additionally requires the defendant to provide some evidence that the police officer used excessive force. *Ellis*, 2008-NMSC-032, ¶ 16. "If a defendant presents any evidence, even slight, to support a jury instruction, he is entitled to the giving of the requested instruction." *Jones*, 2020-NMCA-029, ¶ 8; *see Ellis*, 2008-NMSC-032, ¶¶ 15-16. If "the court concludes that reasonable minds could not find that the officer used excessive force, the matter ends there, and the court should not instruct the jury on the elements of self-defense." *Ellis*, 2008-NMSC-032, ¶ 17.

{32}    Police officers act with excessive force when they use more force than is necessary to effect an arrest, as "viewed objectively from a reasonable officer's perspective." *Id.* ¶ 31. The force must be "unreasonable and unnecessary." *Jones*, 2020-NMCA-029, ¶ 9. The reasonableness of a police officer's actions depends on the facts and circumstances of the encounter, "'including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight.'" *Ellis*, 2008-NMSC-032, ¶ 35 (first alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The objective standard . . . takes into consideration the 'fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Jones*, 2020-NMCA-029, ¶ 9 (quoting *Ellis*, 2008-NMSC-032, ¶ 26).

{33}    Defendant argues that he was entitled to a self-defense instruction because he presented some evidence that Officer Webster acted with excessive force. Specifically, Defendant argues that he presented evidence that (1) he was driving appropriately such that exiting the vehicle with a weapon drawn constituted excessive force and (2) APD considers drawing a weapon to be a use of force at the top of APD's spectrum of force (just below using the weapon). Defendant also contends, without presenting any evidence, that Officer Webster acted with excessive force when he placed his foot on Defendant's foot as a method of control.

{34}    Even if we accept the premise that Defendant was not driving erratically and was not aware that the motorcycle was stolen, *see Ellis*, 2008-NMSC-032, ¶ 2, the evidence that Defendant points to does not allow reasonable minds to differ as to whether Officer Webster used excessive force. Officer Webster exited his vehicle with his gun drawn, but police officers are permitted to unholster their weapons in certain circumstances. Testimony showed that police officers are aware that suspects on motorcycles pose a more immediate threat than those in vehicles because motorcycles do not afford the approaching officer the same protection in a stop. Accordingly, it was reasonable and necessary for Officer Webster to exit his vehicle with his weapon raised because stopping and approaching the motorcycle posed an immediate threat to his safety as a police officer. *See Jones*, 2020-NMCA-029, ¶ 9. Furthermore, the fact that APD considers drawing a weapon a use of force does not render such an action *excessive* force. Most importantly, Officer Webster deescalated the amount of force he used after the encounter began because he holstered his weapon. "[R]easonable minds could not find that [O]fficer [W]ebster used excessive force," as viewed from a reasonable officer's perspective, and the matter of whether Defendant was entitled to a jury instruction for

self-defense ends here. *Ellis*, 2008-NMSC-032, ¶ 17. The trial court properly refused the self-defense instruction.

## C.      Evidentiary Issues

**{35}**     Defendant argues that the trial court erred when it (1) admitted impeachment evidence of Defendant's fraud conviction that was over ten years old, (2) admitted evidence of Defendant's previous encounter with a different police officer, and (3) prohibited Defendant from inquiring into a witness's past act on cross-examination. We conclude that the trial court did not err when it admitted this evidence and limited Defendant's cross-examination.

### 1.      Standard of review

**{36}**    "We review the [trial] court's decision to admit or exclude evidence for an abuse of discretion." *State v. Guerra*, 2012-NMSC-014, ¶ 36, 278 P.3d 1031. "Abuse of discretion is . . . a ruling clearly against the logic and effect of the facts and circumstances before the court." *State v. Lucero*, 1982-NMCA-102, ¶ 14, 98 N.M. 311, 648 P.2d 350 (citation omitted). "A misapprehension of the law upon which a court bases an otherwise discretionary evidentiary ruling is subject to de novo review." *State v. Martinez*, 2008-NMSC-060, ¶ 10, 145 N.M. 220,195 P.3d 1232.

### 2.      The trial court did not abuse its discretion in admitting evidence of Defendant's fraud conviction

**{37}**    Defendant argues that the trial court abused its discretion by allowing the State to introduce evidence of Defendant's eighteen-year-old felony fraud conviction due to its prejudicial nature in light of his forgery charge. Evidence of a conviction where more than ten years have passed since conviction or release is admissible if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect" and the proponent gives proper notice of the intent to use the evidence. Rule 11-609(B) NMRA. Defendant argues that "the State failed to make 'an exceptional showing of probative value'" to support admission of the fraud conviction.

**{38}**    Rule 11-609(B) does not require the trial court to find that evidence has exceptional probative value, only that the probative value "substantially outweighs its prejudicial effect." The trial court here balanced the "probative value, supported by specific facts and circumstances," against the prejudicial effect of the evidence of the fraud conviction before allowing that evidence to be admitted. *See* Rule 11-609(B). The State originally sought to admit evidence of Defendant's 2001 felony convictions for both fraud and forgery for impeachment purposes. The State argued that should Defendant testify, his testimony would "be to contradict some or all of the State's witnesses" such that Defendant's credibility and truthfulness as a witness would become crucial. *See State v. Conn*, 1992-NMCA-052, ¶ 19, 115 N.M. 101, 847 P.2d 746.

**{39}**    The trial court found Defendant's 2001 fraud and forgery convictions "highly probative of Defendant's truthfulness" because even though they were more than ten

years old, fraud and forgery are crimes "involving dishonest acts or false statements." *See* NMSA 1978, § 30-16-6 (2006) (fraud); NMSA 1978, § 30-16-10 (2006) (forgery). The trial court noted that Defendant's credibility could "be a central issue at trial if he testifies." However, because one of the counts Defendant faced at trial was forgery, the trial court decided to exclude evidence of the 2001 forgery conviction. *See State v. Trejo*, 1991-NMCA-143, ¶ 12, 113 N.M. 342, 825 P.2d 1252 ("[C]onvictions for the same crime should be admitted sparingly.") The trial court found that the "[p]rejudice to Defendant from evidence of his 2001 conviction for forgery outweighs the probative value of the evidence in his trial on murder and forgery so as to render the evidence inadmissible for impeachment purposes." However, the trial court allowed the State to introduce evidence of the eighteen-year-old fraud conviction to impeach Defendant's testimony, finding that the probative value of Defendant's fraud conviction "substantially outweighs the prejudicial effect" because Defendant's "credibility may be a central issue at trial if he testifies." The trial court also included a limiting instruction for the fraud conviction that directed the jury to consider evidence of the conviction only as to the truthfulness of Defendant's testimony.

**{40}**     The trial court did not abuse its discretion by admitting evidence of Defendant's fraud conviction.

### 3.     The trial court did not abuse its discretion in admitting evidence of Defendant's previous encounter with a police officer

**{41}**     Defendant argues that the trial court should not have admitted evidence of a past encounter with a different APD officer. He contends that the evidence is inadmissible propensity evidence that is prohibited by Rule 11-404(B) NMRA. The State argues that the trial court properly admitted the evidence under Rule 11-404(B) "to show motive, intent and knowledge."

**{42}**     Evidence of a crime, wrong, or other act may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Rule 11-404(B)(2). Whether evidence may be admitted does not depend on the similarity between the two acts but rather "whether there is a probative use of the evidence that is not based on the proposition that a bad person is more likely to commit a crime." *State v. Jones*, 1995-NMCA-073, ¶ 8, 120 N.M. 185, 899 P.2d 1139. After finding that "'the evidence is relevant to a disputed issue other than the defendant's character, . . . [the trial court] must determine that the prejudicial effect of the evidence does not outweigh its probative value." *State v. Hamilton*, 2000-NMCA-063, ¶ 14, 129 N.M. 321, 6 P.3d 1043 (quoting *State v. Beachum*, 1981-NMCA-089, ¶ 6, 96 N.M. 566, 632 P.2d 1204); *State v. Lovett*, 2012-NMSC-036, ¶ 32, 286 P.3d 265 ("If the evidence is probative of something other than propensity, then we balance the prejudicial effect of the evidence against its probative value." (internal quotation marks and citation omitted)).

**{43}**     The evidence in question was lapel footage and testimony from Officer Byron "Trey" Economidy, who pulled Defendant over in a traffic stop after suspecting that Defendant was driving a stolen scooter about a month before Defendant's encounter

with Officer Webster. After stopping Defendant, Officer Economidy had Defendant place his hands behind his head and then later behind his back. Defendant told Officer Economidy that he had asthma and could not breathe, and he asked for his inhaler. Defendant started coughing and knelt on the ground, but he was able to get to his feet, run away, and evade capture. The State argued that Defendant feigned the asthma attack in order to run away. Officer Economidy also testified that Defendant had no difficulty or apparent pain putting his hands behind his head.

**{44}** The trial court initially excluded this evidence but admitted it after Defendant raised a self-defense claim at trial. Upon reconsideration, the trial court determined that the evidence of the past encounter could demonstrate that Defendant had a plan and was not necessarily acting in self-defense because in both encounters, when contacted by police, he appeared to feign an injury and then attempted to resist or flee. The trial court excluded the part of the lapel footage after Officer Economidy lost contact with Defendant, finding that it was not relevant and was "more prejudicial than probative."

**{45}** The trial court found that the evidence was relevant to Defendant's self-defense claim and then balanced the probative and prejudicial value of the evidence. We conclude that the trial court did not abuse its discretion when it admitted evidence of Defendant's encounter with Officer Economidy.

### 4. The trial court did not abuse its discretion when it prohibited Defendant from cross-examining a witness about a false kidnapping claim

**{46}** Defendant argues that the trial court erred when it prevented him from impeaching Garcia by cross-examining her under Rule 11-608(B) NMRA about an incident when she was thirteen years old in which she falsely claimed she was kidnapped. Defendant intended to use this inquiry to show that Garcia had a pattern of lying to police officers. The trial court prohibited Defendant from inquiring into Garcia's false claim of kidnapping because the court concluded that the false claim was propensity evidence under Rule 11-404(B) that was more prejudicial than probative under Rule 11-403 NMRA.

**{47}** Under Rule 11-608(B), a trial court may allow on cross-examination inquiry into specific instances of a witness's prior conduct if the specific instances are probative of the witness's character for truthfulness. Whether a trial court abused its discretion under Rule 11-608(B) depends on

> (1) whether the witness's testimony is crucial or unimportant, (2) the relevancy of the act of misconduct to truthfulness, (3) the nearness or remoteness of the misconduct to the time of trial, (4) whether the matter inquired into is likely to lead to time-consuming, distracting explanations on cross-examination or re-examination, and (5) whether there will be unfair humiliation of the witness and undue prejudice to the party who called the witness.

*State v. Patterson*, 2017-NMCA-045, ¶ 11, 395 P.3d 543 (quoting 1 Kenneth S. Brown et al., *McCormick on Evidence*, § 41 (7th ed. 2016)). These factors are also relevant to a Rule 11-403 analysis in which the trial court determines whether the evidence's "probative value is substantially exceeded by danger of unfair prejudice." *Patterson*, 2017-NMCA-045, ¶ 7. The first three factors of the Rule 11-608(B) analysis "relate to the probative value of the evidence" while the last two factors go to prejudicial value. *Patterson*, 2017-NMCA-045, ¶ 16.

**{48}**    The trial court did not abuse its discretion under Rule 11-608(B) or Rule 11-403 when it excluded inquiry on cross-examination into Garcia's kidnapping claim. The probative value of the kidnapping claim was minimal. The incident had occurred eight years prior to the trial, and it is unclear whether Garcia had lied to police about the kidnapping or just to the friend to whom she made the claim. Garcia's testimony and her credibility were important, even though she was not the sole witness and even though there was video evidence of the incident. Also, Defendant could impeach Garcia's credibility with other information such as evidence revealing that Garcia lied to police on other occasions and had been arrested on a material witness warrant. Inquiring into the kidnapping would not have been unfairly humiliating to Garcia, but it would have been distracting because it would have led to Garcia explaining that the alleged kidnapping incident was a joke.

**{49}**    Upon application of the test set forth in *Patterson*, we conclude that the trial court did not abuse its discretion with regard to any of the three evidentiary issues that Defendant argues.

### D.    Juror Misconduct

**{50}**    Defendant argues that the trial court should have granted an additional evidentiary hearing due to alleged juror misconduct under *Kilgore v. Fuji Heavy Indus. Ltd.*, 2010-NMSC-040, ¶¶ 22-23, 148 N.M. 561, 240 P.3d 648, and that the trial court erred in denying Defendant's motion for a new trial.

**{51}**    We review "the trial court's factual findings and its ruling on the movant's motion for a new trial . . . for an abuse of discretion." *Id.* ¶ 20.

**{52}**    The question surrounding juror misconduct and its resulting extraneous information "is whether there is a 'reasonable probability' or a likelihood that the extrinsic communications or conduct would have an effect upon the verdict or upon a typical juror." *Prudencio v. Gonzales*, 1986-NMCA-101, ¶ 6, 104 N.M. 788, 727 P.2d 553 (citation omitted). An appropriate remedy for possible extraneous material affecting the verdict is usually "an evidentiary hearing, rather than a new trial," to give the moving party "an opportunity to prove a reasonable probability of prejudice." *Kilgore*, 2010-NMSC-040, ¶ 29. The moving party has the burden "throughout the proceedings to establish that (1) material extraneous to the trial actually reached the jury, (2) the extraneous material relates to the case being tried, and (3) it is reasonably probable that the extraneous material affected the jury's verdict or a typical juror." *Id.* ¶ 21. This burden requires an affirmative showing, not a mere allegation. *State v. Mann*, 2002-

NMSC-001, ¶ 19, 131 N.M. 459, 39 P.3d 124. In *Kilgore*, the trial court held that the plaintiffs were entitled to an evidentiary hearing "to prove that there [was] a reasonable probability that the extraneous material affected the verdict or a typical juror" because the plaintiffs established that the extraneous information reached one of the jurors and that the information "was relevant to the case being tried." 2010-NMSC-040, ¶¶ 24-25, 28.

{53}　In this case, after the jury returned the verdict, the trial court was informed that one alternate juror received extraneous information during the trial. The trial court held a hearing in which it, Defendant, and the State interviewed the alternate juror and the person who reported the juror misconduct. The alternate juror testified that on one afternoon during the course of the trial, she was home with her husband. Her husband told her that he had watched a livestream of the trial and heard the attorneys discussing what clothes Garcia would wear when she testified, specifically whether she would wear her jail-issued clothing that would show that she was in custody. At the time her husband shared this extraneous information, the alternate juror had already learned that Garcia was in jail based on Garcia's earlier testimony.

{54}　The alternate juror testified that she did not share the information her husband shared with her, or any other information, with any other jurors. When asked about the possibility that other jurors may have also had access to extraneous information, the alternate juror testified that while one juror may have used her phone to make a personal call, no jurors used their phones during the trial. Additionally, the jurors did not make any mention of the livestream of the trial. The alternate juror did not participate in the jury deliberations.

{55}　Based on the testimony at the hearing, the trial court concluded that no other extraneous information reached the jury and denied Defendant's motion for a new trial and an additional evidentiary hearing. The trial court concluded that the extraneous material in this case did not pose a "'reasonable probability' of prejudice" to Defendant because the information was duplicative of what the alternate juror learned through Garcia's testimony, Garcia's attire was not a material fact in the case, and "[t]he extraneous information did not reach any of the jurors who deliberated." The trial court noted that it was "convinced that there was no other extraneous—or any extraneous information that made its way to the deliberating jury in this case." Thus, the trial court declined to call other jurors in for questioning.

{56}　Defendant argues that another evidentiary hearing is necessary under *Kilgore* because the alternate juror provided evidence that other jurors were on their phones during the trial. Defendant alleges that because the trial was livestreamed, the jury had general access to information about the trial through their phones. However, Defendant does not establish how that testimony shows that extraneous material related "to the trial *actually reached the jury*" as would be necessary to warrant an evidentiary hearing. *Kilgore*, 2010-NMSC-040, ¶ 21 (emphasis added); *Prudencio*, 1986-NMCA-101, ¶ 6. Instead, his argument in favor of an evidentiary hearing rests on a mere allegation that extraneous evidence may have reached the jury. Thus, we conclude that the trial court did not abuse its discretion when it denied an evidentiary hearing.

**III.    CONCLUSION**

**{57}**    Because we conclude that the trial court did not err with regard to its communications with the jury, the self-defense instruction, admission and exclusion of evidence, and juror misconduct, we conclude also that there is no issue of cumulative error.

**{58}**    We affirm Defendant's convictions.

**{59}    IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**BARBARA J. VIGIL, Justice**

**DAVID K. THOMSON, Justice**