This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-39328

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**JASON TAYLOR,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Drew D. Tatum, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Emily Bowen, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**HENDERSON, Judge.**

**{1}** A jury convicted Defendant Jason Taylor of receiving stolen property over five hundred dollars, a fourth degree felony, contrary to NMSA 1978, Section 30-16-11 (2006). Defendant appeals, arguing (1) the district court erred in denying his motion to suppress; (2) there is insufficient evidence to support his conviction for possession of stolen property; and (3) the district court abused its discretion when it denied his motion for a mistrial. We affirm.

**DISCUSSION**

**I.      Motion to Suppress**

**{2}**     Defendant argues that the district court erred in denying his motion to suppress for two reasons. First, he argues that once the officer's concerns under the community caretaking doctrine were dispelled, his actions from that point forward were investigatory, violating his rights under the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution. Second, he argues that the officer lacked reasonable suspicion to seize Defendant. We are not persuaded by either argument.

**{3}**     The district court denied Defendant's motion to suppress, finding that the officer's initial encounter with Defendant was valid under the community caretaker exception to the warrant requirement since the officer articulated a specific safety concern. While the district court found that the community caretaker exception applied to the initial encounter, it acknowledged that the officer "quickly ascertained that . . . Defendant and [his wife] were not in peril and did not need assistance." Ultimately, the district court found that the stop was expanded into an investigatory stop and the "expansion of the stop was proper and was supported by reasonable suspicion . . . that Defendant was breaking or had broken the law."

**{4}**      On appeal from a district court's ruling on a motion to suppress, "we afford de novo review of the [district] court's legal conclusions." *State v. Leyba*, 1997-NMCA-023, ¶ 8, 123 N.M. 159, 935 P.2d 1171. However, "we will not disturb the [district] court's factual findings if they are supported by substantial evidence." *Id.* In determining whether the law was correctly applied to the facts, we view "the facts in the light most favorable to the prevailing party." *State v. Cline*, 1998-NMCA-154, ¶ 6, 126 N.M. 77, 966 P.2d 785.

**{5}**     Defendant initially argued in his brief in chief that he was subject to an unconstitutional seizure because the officer was conducting an investigation from the start. However, in his reply brief Defendant concedes that the community caretaker exception applied to his initial encounter with the officer.[1] While we are not bound by a party's concession, our own review of the record supports Defendant's concession. *See State v. Palmer*, 1998-NMCA-052, ¶ 12, 125 N.M. 86, 957 P.2d 71.

**{6}**     It is well established that an officer acting as a community caretaker is a recognized exception to the Fourth Amendment. *See State v. Ryon*, 2005-NMSC-005, ¶ 12, 137 N.M. 174, 108 P.3d 1032; *see also Schuster v. N.M. Dep't of Tax'n & Revenue*,

---

[1]To the extent that Defendant argues that the officer's initial interaction with him was pretextual, we deem this argument to be waived because Defendant failed to assert this claim in the district court and in any event concedes that the community caretaker exception applied to his initial interaction with the officer. *Cf. State v. Ochoa*, 2009-NMCA-002, ¶ 11, 146 N.M. 32, 206 P.3d 143 (holding that the defendant's pretextual argument had been properly preserved because he developed relevant facts in the district court).

2012-NMSC-025, ¶ 26, 283 P.3d 288 ("An officer who is acting as a community caretaker does not violate the Fourth Amendment."). In *Ryon*, our Supreme Court clarified that "[w]hen determining whether a warrantless search or seizure is reasonable on the basis of the community caretaker exception, we must measure the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen." 2005-NMSC-005, ¶ 24 (internal quotation marks and citation omitted). Accordingly, "[t]he test we employ is one of objective reasonableness based on the totality of the circumstances." *Schuster*, 2012-NMSC-025, ¶ 26. Therefore, "[w]hen police act as community caretakers . . . the existence of reasonable suspicion or grounds for probable cause are not appropriate inquiries." *Ryon*, 2005-NMSC-005, ¶ 20. While Defendant raises his seizure argument under both the federal and state constitutions, he neither provides us with any law indicating that we treat the community caretaker doctrine differently under our state constitution, nor argues that it should be treated differently; therefore we will not do so. *See State v. Garcia*, 2009-NMSC-046, ¶ 27, 147 N.M. 134, 217 P.3d 1032 (stating that "[u]nder our interstitial approach to interpreting the New Mexico Constitution, we may diverge from federal precedent where the federal analysis is flawed, where there are structural differences between the state and federal governments, or because of distinctive New Mexico characteristics").

**{7}** Considering the totality of the circumstances, the officer stopped his car on the side of the road to check on Defendant based on a "specific, articulable safety concern in [his] capacity as [a] community caretaker[]." *See Ryon*, 2005-NMSC-005, ¶ 16 (internal quotation marks and citation omitted). The officer testified that he saw a parked car with its hazard lights activated and he decided, consistent with department policy, to stop and check on the vehicle because he was concerned that someone might need help. In fact, two vehicles were present, a Tahoe and a Mitsubishi, which was affixed to a tow dolly hitched to the back of the Tahoe. Although the officer was driving in his police car and had his emergency lights on, he parked on the opposite side of the road from the vehicles. The officer's initial actions and interactions with Defendant, who was accompanied by his wife at the time, were consistent with the officer's stated concern related to Defendant's use of hazard lights on the Tahoe, and appeared to in no way curtail Defendant's freedom to leave had he chosen to do so. *See State v. Walters*, 1997-NMCA-013, ¶ 22, 123 N.M. 88, 934 P.2d 282 (stating that "[p]rohibiting the use of emergency lights in [community caretaker cases] would require an officer to approach a stopped car at night without an immediate means of conveying that he presents no threat to the occupant of the car"); *cf. State v. Lopez*, 1989-NMCA-030, ¶ 12, 109 N.M. 169, 783 P.2d 479 (finding that a defendant was seized when "[t]he police officers used their vehicle to block [the] defendant's vehicle . . . and . . . invoke[ed] their authority as police officers by displaying badges"). Once the officer made contact with Defendant, he asked, "How are you? What's going on?" The officer's question of how Defendant was doing can be objectively viewed as a question that arose out of concern for Defendant, and not an intent to investigate. *See Schuster*, 2012-NMSC-025, ¶ 28.

**{8}** In response to the officer's inquiry, Defendant replied, "Good, just uh . . . just getting the car right here, my wife's car." Despite it being 2:30 in the morning, Defendant

explained that he "finally got a dolly" to load the Mitsubishi. The officer then asked Defendant if the car had stopped working. Defendant replied, "No, it's been sitting here." Defendant elaborated that he was trying to get the car back to his house, a task he and his wife had been trying to accomplish the past few days. When the officer asked Defendant and his wife who the car was registered to, Defendant's wife stated it was registered to a person named "Tim" but she could not remember his last name. Defendant's wife proceeded to point at a house adjacent to the road and said, "The gentlemen that lives in this house right here, he would know." The officer then asked Defendant's wife, "So you said this is your vehicle, how long have you owned this vehicle?" Defendant's wife replied that she's had the vehicle "for a while." The officer asked, "So you have the insurance for it and stuff?" Defendant's wife responded that she did not because the car was inoperable. Defendant's wife added that the car has been parked in the same spot for months. At this point the officer ran the license plate on the car through dispatch. About one minute after running the license plate through dispatch, the officer was informed that the car belonged to a third party, whose name was not "Tim." The officer then asked for Defendant and his wife's IDs, names, and dates of birth.

**{9}** Despite conceding the initial applicability of the community caretaking doctrine, Defendant insists that the officer's role as a community caretaker ceased after the officer asked Defendant, "How are you? What's going on?" According to Defendant, since he "did not state that he needed help or was in peril . . . the officer's community caretaking function ended, especially because thereafter [the officer] did not ask if [Defendant and his wife] needed help." Thus, Defendant asserts that the officer's subsequent request for his identification and running the license plates on the Mitsubishi and Tahoe through dispatch were actions that went beyond the officer's role as a community caretaker. Defendant's contention is without merit. In "carry[ing] out the officer's community caretaker function, an officer should be allowed to identify, with certainty, the person with whom he is dealing." *State v. Reynolds*, 1995-NMSC-008, ¶ 18, 119 N.M. 383, 890 P.2d 1315 (internal quotation marks and citation omitted). Furthermore, our Supreme Court has stated that "individuals have no legitimate subjective expectation of privacy in their license, registration, or insurance documents when they are operating a motor vehicle and an officer requests to see such documents." *Id.* ¶ 12. Accordingly, "whenever an officer is reasonably called upon to make contact with a driver (such as at border checkpoints and community caretaker functions), the officer has the right to know with whom he is talking and may check to see that the driver is both licensed and driving a car that is registered and insured." *Id.* ¶ 21. And "[a]fter obtaining the documents, the officer may lawfully run a computer check, directly or indirectly by contacting dispatch, in regard to the documents obtained." *State v. Rubio*, 2006-NMCA-067, ¶ 14, 139 N.M. 612, 136 P.3d 1022. Thus, we conclude that the officer was acting well within his role as a community caretaker during this initial interaction.

**{10}** Nevertheless, the officer expanded his role from being a community caretaker to investigating possible criminal activity. "This expansion must also be constitutional, which requires reasonable, articulable suspicion." *Schuster*, 2012-NMSC-025, ¶ 29; *see*

*also State v. Leyva*, 2011-NMSC-009, ¶¶ 54-55, 149 N.M. 435, 250 P.3d 861 (rejecting the federal bright-line test for purposes of the New Mexico Constitution and requiring support for police questioning unrelated to the reasons for the stop, including reasonable suspicion, officer safety, or a consensual encounter).

**{11}**    There are ample facts in the record to support a finding that the officer had reasonable, articulable suspicion to expand what was a community caretaker function into an investigation of stolen property. After running that information through dispatch, the officer asked Defendant who the Tahoe, which he and his wife were driving, belonged to. Defendant responded that the Tahoe belonged to his sister. The officer asked for the name of Defendant's sister and asked Defendant whether the Tahoe was registered to her. Defendant gave his sister's name and confirmed that the Tahoe was registered to her. Seemingly still attempting to understand the situation, the officer then asked Defendant who lives in the house that his wife had previously pointed to. Defendant replied that he did not know who lives in the house. The officer then asked Defendant's wife who lives in the house. At first, Defendant's wife replied that she knew who lives in the house, but could not remember the person's name. Then Defendant's wife stated, "His name is Tim too as a matter of fact." At this point, the officer told Defendant and his wife, "Here's the thing, none of this is making sense to me." Defendant replied, "What do you mean none of it is making sense?" The officer responded, "You guys said you own this vehicle, but you don't have any of the information to the vehicle."

**{12}**    At the suppression hearing, the officer testified that the circumstances, including discrepancies in the statements from Defendant and his wife, as well as Defendant's use of only the Tahoe's hazard lights and the Texas license plate on the Mitsubishi, were concerning and he began to suspect that Defendant was attempting to steal the vehicle. Although Defendant's wife stated she had the keys to the vehicle, neither she nor Defendant could respond to the officer's concern about not having information to the vehicle beyond incompletely naming people who could vouch for them. Neither Defendant nor his wife attempted to contact or provide contact information for the people they named to verify that the car did, in fact, belong to Defendant's wife. The information provided by Defendant and his wife, throughout their interaction with the officer, was not consistent with what the officer discovered when conducting permissible information checks. Considering the totality of the circumstances, we conclude that the officer had reasonable suspicion, based on particularized and articulable facts, that Defendant may have been stealing property so as to permit the officer to expand his interaction with Defendant into an investigatory stop.

**{13}**    During the course of his investigation, the officer's suspicions regarding Defendant's involvement in possible criminal activity continued to grow. The officer obtained information that the license plate on the Tahoe driven by Defendant and his wife was registered to a different car. Furthermore, when the officer asked Defendant who the tow dolly belonged to, Defendant stated it belonged to his friend, but he could not provide the officer with a phone number for his friend or a description of where the friend lived apart from "south of town here." The officer testified that the tow dolly

appeared to have U-Haul stickers "scraped off." The officer asked Defendant where the license plate on the tow dolly was, and Defendant replied that he did not know. Defendant's inability to answer basic questions about the tow dolly's origins, as well as the possible attempt to hide its connection to U-Haul, were sufficient to give the officer a belief that the tow dolly was stolen. At this point, Defendant was placed in handcuffs, and the officer informed him that he was being detained because the officer believed the tow dolly to be stolen. About thirty minutes after Defendant was detained, a U-Haul employee arrived on scene to aid the officer in identifying the tow dolly, and the employee stated that it had been stolen in Portales, New Mexico. Based on this information, the officer had probable cause to arrest Defendant for possession of stolen property. *See State v. Ochoa*, 2004-NMSC-023, ¶ 9, 135 N.M. 781, 93 P.3d 1286 (stating "[p]robable cause exists when the facts and circumstances warrant a belief that the accused had committed an offense, or is committing an offense").

**{14}**   We conclude that the community caretaker exception applied up until the point that the officer became aware of the inconsistencies in Defendant's statements relating to the vehicles. After this point, the officer had reasonable suspicion to expand the scope of his interaction into a criminal investigation, and this led to the officer developing probable cause to arrest Defendant. Accordingly, Defendant was constitutionally seized and his motion to suppress was properly denied.

## II.   Sufficiency of the Evidence

**{15}**   Defendant argues there was insufficient evidence to prove the third and fourth elements in the jury instruction for receiving stolen property. *See* UJI 14-1650 NMRA. In reviewing a sufficiency of the evidence claim, we must determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). The responsibility falls on the reviewing court "to ensure that the jury's decisions are supported by evidence and by reasonable inferences from that evidence." *State v. Montoya*, 2021-NMCA-006, ¶ 12, 482 P.3d 1285. "[W]e must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. For purposes of reviewing sufficiency of the evidence, the jury instructions become the law of the case. *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409.

**{16}**   Regarding the third element, the jury was instructed that to convict Defendant of receiving stolen property it must find that "[a]t the time [D]efendant kept th[e] tow dolly, [D]efendant knew or believed that it had been stolen." Defendant argues that the State failed to prove that he had the "specific intent to keep a tow dolly that he knew to be stolen." The State contends that the jury received substantial evidence that Defendant knew or believed the tow dolly was stolen. According to the State, "[d]irect evidence that Defendant knew an item was stolen is not necessary to prove the knowledge element." We agree with the State.

**{17}** We have previously held that a person has knowledge of stolen property "if he or she either (1) actually knows the property is stolen, (2) believes the property is stolen, or (3) has his or her suspicions definitely aroused and refuses to investigate for fear of discovering that the property is stolen." *State v. Sizemore*, 1993-NMCA-079, ¶ 9, 115 N.M. 753, 858 P.2d 420. "Unless a defendant admits knowledge of the fact that goods [they have] received are stolen, this knowledge of necessity must be established by circumstantial evidence." *State v. Lindsey*, 1969-NMCA-121, ¶ 22, 81 N.M. 173, 464 P.2d 903. A defendant's knowledge that property is stolen may be circumstantially proven by a defendant's unexplained possession of that property. *Sizemore*, 1993-NMCA-079, ¶ 6. It is improper, however, to infer a defendant's knowledge from their mere possession without some basis in fact for the initial inference. *Id.*

**{18}** We conclude there is sufficient evidence, in addition to possession, to support the jury's inference that Defendant knew the tow dolly was stolen. Here, although Defendant told the officer that he got the tow dolly from his friend, Defendant also told the officer, "I don't know the deal about the trailer or tow dolly or nothing." When the officer asked Defendant if his friend purchased the tow dolly, Defendant replied, "I think so." Moreover, Defendant could not provide the officer with his friend's phone number or information about where his friend lived. In addition to Defendant's lack of explanation regarding his friend whom he claimed owned the tow dolly, the tow dolly was orange, and had phrases like "U-Haul" or "Property of U-Haul" printed on it that appeared as if someone had attempted to scratch them off. One of the stickers stated, "Not to be Sold." Taken together, there was sufficient circumstantial evidence to support the jury's reasonable inference that Defendant knew that the tow dolly was stolen.

**{19}** Next, in regard to the fourth element, the jury was instructed that a conviction for receiving stolen property required it to find that "[t]he tow dolly had a market value over $500." Defendant argues that "there was no evidence presented at trial as to the market value of the 18-year-old tow dolly." While Defendant acknowledges that the State "effectively proved" that the U-Haul owner replaced the tow dolly for $1,800, he asserts that it failed to prove "beyond a reasonable doubt the market value of the tow dolly in question." The State contends that there was substantial evidence to support the jury's finding that the tow dolly had a market value over $500. We agree.

**{20}** During the trial, the owner of the U-Haul franchise where the tow dolly was stolen from testified that it would cost $2,500 to replace the stolen tow dolly, that the tow dolly was in working condition prior to being stolen, and that he had recently purchased a used tow dolly, that was not as nice as the stolen tow dolly, from a third-party seller and paid $1,800. The franchise owner's testimony is similar to an employee-witness' testimony in *State v. Hughes*, where we held that the employee-witness' testimony concerning the condition and replacement cost of stolen property "was tantamount to an owner's opinion as the value of the property in its condition at trial and also as to the cost of purchasing new replacement property." 1988-NMCA-108, ¶ 10, 108 N.M. 143, 767 P.2d 382. Furthermore, the jury in this case heard testimony from the officer that the tow dolly appeared to be newer and that it had no rust or damage on it. Based on the foregoing testimony, and the lack of a showing that the tow dolly was in any form of

disrepair prior to being stolen, sufficient evidence was presented to establish that the tow dolly had a market value of over $500.

### III. Motion for Mistrial

**{21}** Lastly, Defendant argues that the district court abused its discretion when it denied his motion for a mistrial. Defendant moved for a mistrial because the jury signed both guilty and not guilty verdict forms. Defendant argues that his motion for mistrial should have been granted by the district court since "[t]he fact that both verdict forms were signed could possibly indicate a hung jury." Instead of granting a mistrial, the district court remedied the error by providing the jury with new verdict forms and polling the jury at Defendant's request.

**{22}** We review a district court's ruling on a motion for mistrial for abuse of discretion. *State v. Swick*, 2012-NMSC-018, ¶ 68, 279 P.3d 747. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* (internal quotation marks and citation omitted). Defendant's argument is limited to mere speculation that the jury was hung since both verdict forms were signed. In *State v. Lymon*, our Supreme Court addressed this exact issue, holding that a district court did not abuse its discretion by providing new verdict forms after a jury had previously signed both the guilty and not guilty verdict forms. 2021-NMSC-021, ¶¶ 8, 28, 488 P.3d 610. Just as in *Lymon*, in the present case, the district court did not "bring attention to the jury's inconsistent verdict in a way that may have been considered criticism or coercion," and as the *Lymon* Court indicated is its preference, the district court polled the jury. *Id.* ¶¶ 27-28. We therefore conclude that the district court did not abuse its discretion in denying Defendant's motion for mistrial. *Id.* ¶ 28.

### CONCLUSION

**{23}** For the foregoing reasons, we affirm Defendant's conviction.

**{24} IT IS SO ORDERED.**

**SHAMMARA H. HENDERSON, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**KATHERINE A. WRAY, Judge**