The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: August 26, 2024

**NO. S-1-SC-39691**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**SEIG ISAAC CHAVEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Abigail Aragon, District Judge**

Rothstein Donatelli LLP
Marc M. Lowry
Roshanna K. Toya
Albuquerque, NM

for Appellant

Raúl Torrez, Attorney General
Meryl E. Francolini, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**BACON, Justice.**

{1}     In this direct appeal from his convictions for first-degree murder (willful and deliberate) and tampering with evidence, Defendant Seig Isaac Chavez raises four issues: insufficient evidence, improper denial of his motion to change venue, prosecutorial comment on silence, and improper admission of an audio recording of a jail phone call from Defendant to his son. We hold that the district court's admission of the jail phone call was plain error, and accordingly we vacate Defendant's convictions. We further hold that Defendant's convictions were supported by substantial evidence, and thus double jeopardy does not preclude retrial on the charges. In view of our disposition, we do not reach the remaining issues raised in this appeal.

**I.     BACKGROUND**

{2}     On the evening of August 15, 2019, Defendant drove into the parking lot of the Little Moon restaurant in Las Vegas, New Mexico. William "Skip" Smith (Victim) was sitting on the sidewalk. Victim was a developmentally disabled man who lived in a boarding home, did not work or drive, and was known in the community to frequent businesses along Grand Avenue. According to an employee of the Little Moon, Defendant approached Victim and invited Victim to go with him

to get food at another location. Victim readily got into Defendant's truck. According to this witness, the encounter was brief and nonaggressive.

{3} The following day, Victim's body was found in an alleyway. He had been stabbed 24 times, sustaining wounds to his head, neck, trunk, and extremities. Some wounds appeared to be defensive. As Defendant was the last person to be seen with Victim, Defendant became the prime suspect.

{4} Surveillance video showed that Defendant had driven past Victim several times before their encounter. Defendant was first seen driving his gold colored pickup truck, with a silver colored toolbox in the bed, southbound along Grand Avenue as Victim walked north towards the Little Moon. Defendant passed Victim and made a right turn off Grand Avenue where he turned around and then drove northbound along Grand Avenue. About two minutes later, Defendant made another U-turn, drove southbound again, and entered the Little Moon parking lot. Defendant drove past Victim to the back of the lot, then returned to park in a spot closer to Grand Avenue. Defendant remained in his parked truck for approximately one minute and forty seconds before exiting the truck and approaching Victim.

{5} When police located Defendant ten days after finding Victim's body, they observed that Defendant's truck had been sanded down to a gray color. The toolbox in the bed had been painted black from its previous silver color. During a subsequent

search, Police found sandpaper and cans of black spray paint at Defendant's home. Police cut three pieces of upholstery from the passenger seat of Defendant's truck of which two later tested positive for Victim's blood. Victim's blood was also found on the sleeve of a jacket found in Defendant's home.

{6}     Prior to trial, the State moved in limine for the admission of Defendant's jail phone calls, including one call to his teenage son. In that call, Defendant is heard to say:

> And you don't trust anybody. You keep that door locked. And you keep your fucking knife on you. Anybody gets close to you, you stick 'em in their fucking throat, and you stick 'em again and again. I ain't fucking around. This is your daddy telling you this.
>
> Anybody tries touching you, you put that fucking knife straight in their fucking throat, and you do it again and again until they don't fucking move. Then you do it to everybody. You're the man of the house. You are the one to protect everyone. Time for you to grow up, son. You understand me?
>
> I'm ordering you. And I'll go down and go to hell for it. You don't worry about that shit. I'm telling you to do this. You keep that knife in your pocket that I got you, that sharp one. And you keep it on you at all times. And you never let that fucking thing out of your sight. You understand me?
>
> And I don't give a fuck who it is. If they look at you funny or . . . you don't trust nobody. You don't turn your back on nobody. You make sure them doors are locked at all fucking times. And you get up—anybody tries touching you—you stick that fucker. You bury it in their fucking throat. You understand me?
>
> I ain't fucking around, dude. Daddy's going to prison.

{7}   The State argued that those statements were admissible because they were "relevant as several injuries sustained by [Victim] were stab wounds to the throat area." Citing Rule 11-801(D)(2) NMRA, the State argued that the statements were not hearsay because they were statements of a party opponent, made by Defendant but offered by the State against Defendant. Moreover, the State argued Defendant had no reasonable expectation of privacy in the conversations because he was on notice that his phone calls were being recorded. Defense counsel responded that a ruling on admissibility would be premature because the State provided incomplete transcripts.

{8}   At the hearing on the motion, the State again argued that the jail phone calls were admissible as relevant "habit" evidence. Defense counsel stipulated that the State did not need to lay "normal[]" foundation for the jail phone calls, but objected to the relevance of the recordings, noting that "even if the State is trying to show habit," it is not relevant. Although Defense counsel stated that he did not "know how it's relevant," he did not raise the issue of improper character evidence under Rule 11-404(A) NMRA or the danger of unfair prejudice under Rule 11-403 NMRA. The district court observed that "relevancy is a low burden" and held that the danger of unfair prejudice did not substantially outweigh the probative value of the statements. Defense counsel later stipulated to the admission of the jail phone calls. In its written

order, the district court relied on the stipulation as the basis for admitting the jail phone calls into evidence and provided no further rationale.

{9}     Based on the above-described evidence that the State adduced at trial, the jury convicted Defendant of first-degree murder and tampering with evidence. The district court sentenced Defendant to "thirty (30) years to Life Imprisonment"[1] plus three years, to be served concurrently.

## II.     DISCUSSION

### A.     The Admission of the Jail Phone Call Was Plain Error

### 1.     Standard of review

{10}     Unpreserved evidentiary errors are reviewable on appeal under a plain error standard. Rule 11-103(E) NMRA. Because "[p]lain error is an exception to the

---

[1]We note that the district court erred by imposing a term-of-years sentence for first-degree murder. The mandatory minimum sentence for first-degree murder is life. NMSA 1978, § 30-2-1(A) (1994) ("Whoever commits murder in the first degree is guilty of a capital felony."); NMSA 1978, § 31-18-14 (2009) ("When a defendant has been convicted of a capital felony, the defendant shall be sentenced to life imprisonment or life imprisonment without possibility of release or parole."); *see generally Compton v. Lytle*, 2003-NMSC-031, ¶ 12, 134 N.M. 586, 81 P.3d 39 (discussing the difference between life and term-of-years sentences), *superseded by statute on other grounds as stated in State v. Tafoya*, 2010-NMSC-019, ¶ 16, 148 N.M. 391, 237 P.3d 693. We note this error because it implicates our direct appellate jurisdiction, which only obtains "from a judgment of the district court imposing a sentence of death or life imprisonment." N.M. Const. art. VI, § 2. But because we vacate Defendant's convictions in this opinion, we do not otherwise address the error.

general rule that parties must raise timely objection to improprieties at trial, . . . it is to be used sparingly." *State v. Dylan J.*, 2009-NMCA-027, ¶ 15, 145 N.M. 719, 204 P.3d 44 (internal quotation marks and citation omitted). We will not reverse on the basis of plain error unless the error "affect[ed] a substantial right" of the defendant. Rule 11-103(E).

{11} For a determination of plain error, we have interpreted this language to require "that admission of the [evidence] constituted an injustice that created grave doubts concerning the validity of the verdict." *State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056 (internal quotation marks and citation omitted). However, plain error does not require that "the defendant's guilt is so doubtful that it would shock the conscience of the court to allow it to stand." *State v. Lucero*, 1993-NMSC-064, ¶ 13, 116 N.M. 450, 863 P.2d 1071. Instead, the focus of plain error review is on the fairness of the trial. Under plain error review, we consider the error's effect on the overall "fairness, integrity, or public reputation of judicial proceedings." *State v. Paiz*, 1999-NMCA-104, ¶ 28, 127 N.M. 776, 987 P.2d 1163 (quoting *U.S. v. Olano*, 507 U.S. 725, 736 (1993) (internal quotation marks omitted)). "An error may seriously affect the fairness, integrity or public reputation of judicial proceedings

6

independent of the defendant's innocence." *Olano*, 507 U.S. at 736-37 (text only)[2] (citation omitted).

{12}    We apply this standard to the facts of this case by examining whether the district court committed error when it admitted the jail phone call, then asking whether this admission affected a substantial right of Defendant and significantly affected the verdicts. Because we conclude that all of those conditions are met, we vacate Defendant's convictions.

**2.    The admission of the jail phone call was error**

{13}    "Evidence is relevant if [] it has any tendency to make a fact more or less probable than it would be without the evidence, and [] the fact is of consequence in determining the action." Rule 11-401 NMRA. Ordinarily, "[r]elevant evidence is admissible." Rule 11-402 NMRA. However, two exceptions are important here: the prohibition on propensity evidence, and the prohibition on evidence that is substantially more prejudicial than probative.

{14}    Under Rule 11-404(A)(1), character evidence is not admissible to prove a person's propensity to act in a certain manner. *Id.* ("Evidence of a person's character

---

[2]The "text only" parenthetical indicates omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

7

or character trait is not admissible to prove that on a particular occasion the person acted in accordance with [or exhibited a propensity for] the character or trait."). Propensity evidence is inadmissible for its probative value solely. "One might argue that the defendant's propensity to commit the crime would be highly relevant evidence. Indeed, it might. Its exclusion is based on policy concerns, not on relevancy grounds." 1 Barbara E. Bergman, et al., *Wharton's Criminal Evidence* § 4:22 (15th ed. 2023).

{15} Those policy concerns center on the potential for wrongful conviction. "[J]urors are too likely to give undue weight to evidence of a defendant's prior misconduct and perhaps even to convict the defendant solely because of a belief that the defendant is a bad person." *State v. Lovett*, 2012-NMSC-036, ¶ 31, 286 P.3d 265 (internal quotation marks and citation omitted); *accord* Bergman, *supra*, § 4:18 (noting the policy concern that "jurors may well convict not because they believe the defendant is guilty of the current charges, but because he appears to be a person of bad character"). This longstanding prohibition on propensity evidence is fundamental to a fair trial, as it flows from the presumption of innocence. *See, e.g.,* *U.S. v. Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980) ("It is fundamental to American jurisprudence that a defendant must be tried for what he did, not for who he is. That precept is . . . [a] concomitant of the presumption of innocence." (internal quotation

marks and citation omitted)); *see also People v. Allen*, 420 N.W.2d 499, 504 (Mich. 1988) ("[I]n our system of jurisprudence, we try cases, rather than persons." (citation omitted)).

{16} Although character evidence is categorically inadmissible if it is relevant *only* to the defendant's propensity to commit the crime charged, Rule 11-404(A)(1), it may be admissible to prove something other than propensity. *See, e.g., State v. Samora*, 2016-NMSC-031, ¶ 40, 387 P.3d 230 (noting that the "rule only prohibits the use of otherwise relevant evidence when its *sole purpose or effect* is to prove criminal propensity" (internal quotation marks and citation omitted)). In a criminal case, evidence of a defendant's "crime, wrong, or other act" that could be probative of character may be admissible for a nonpropensity purpose "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(1)-(2) NMRA.[3] These examples of permissible uses are "intended to be illustrative rather than exhaustive, and evidence

---

[3]Even though the jail phone call contained statements of Defendant's opinion or belief rather than evidence of a prior "crime, wrong, or other act," we nevertheless look to the examples listed in Rule 11-404(B)(2) to determine whether the evidence could be relevant to an issue other than propensity. *See, e.g., State v. Allen*, 2000-NMSC-002, ¶ 44, 128 N.M. 482, 994 P.2d 728 (determining that the defendant's "statement of his intent to 'shoot it out' with" police was not, strictly speaking, "a prior bad act" and that it was admissible as nonpropensity "consciousness of guilt" evidence).

of other wrongs may be admissible on alternative relevant bases so long as it is not admitted to prove conformity with character." *State v. Martinez*, 1999-NMSC-018, ¶ 27, 127 N.M. 207, 979 P.2d 718.

{17} The burden is on the proponent of the evidence to identify "a probative use of the evidence that is not based on the proposition that a bad person is more likely to commit a crime." *State v. Lymon*, 2021-NMSC-021, ¶ 42, 488 P.3d 610 (quoting *State v. Jones*, 1995-NMCA-073, ¶ 8, 120 N.M. 185, 899 P.2d 1139); *see also State v. Serna*, 2013-NMSC-033, ¶ 17, 305 P.3d 936 (explaining that the proponent of the evidence bears the burden of demonstrating "the rationale for admitting the evidence to prove something other than propensity") (citation omitted). The proponent must make a cogent argument as to how the evidence has "real probative value, and not just possible worth" to a nonpropensity issue. *Serna*, 2013-NMSC-033, ¶ 17 (internal quotation marks and citation omitted). "In other words, more is required to sustain a ruling admitting other-acts evidence than the incantation of the illustrative exceptions contained in the Rule." *Id.* (text only) (citation omitted).

{18} Additionally, relevant and otherwise admissible evidence may nevertheless be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Rule 11-403. Thus, even "[i]f the evidence is probative of something other than propensity," we still must "balance the prejudicial effect of the

10

evidence against its probative value." *Lymon*, 2021-NMSC-021, ¶ 42 (internal quotation marks and citation omitted).

**a.     The statements in the jail phone call were solely probative of propensity, except one statement that was probative of consciousness of guilt**

{19}     In the jail phone call, Defendant ordered his son, in very clear and graphic terms, to stab "anybody" and "everybody" in the throat with a knife "again and again until they don't fucking move." The self-evident relevance of these statements is to demonstrate that Defendant is the type of person who would kill another person by stabbing the person in the throat multiple times, precisely as the assailant did to the Victim. From there, the natural inference is that because Defendant had the propensity to stab people in the throat, he must have done so to the Victim on the date in question. Such an inference is impermissible. Rule 11-404(A)(1). If Defendant's statements have no purpose other than to allow the jury to draw that impermissible inference, then they are inadmissible. We, therefore, turn to examine the State's various arguments for the admissibility of the jail phone call on other grounds.

{20}     On appeal, the State first argues that the jail phone call was admissible as the statement of a party opponent (the State offered the statement, made by Defendant, against Defendant) under Rule 11-801(D)(2). This argument leapfrogs over the threshold question of admissibility, which is always relevance. *See Lovett*, 2012-

11

NMSC-036, ¶ 30 ("Only relevant evidence is admissible."); Rule 11-402 ("Irrelevant evidence is not admissible."). Relevant evidence is probative evidence. Rule 11-401 (stating that relevant evidence is that which tends to make a material "fact more or less probable than it would be without the evidence"). Like any other evidence, the admissibility of the statement of a party opponent depends on whether the statement is probative of a material fact. Thus, contrary to the State's position, the jail phone call was *inadmissible* simply because it was a statement of a party opponent solely—while instead, it must prove something meaningful to the case.

{21} To determine the threshold relevance of the jail phone call, we examine the State's arguments as to how the jail phone call was potentially probative of a fact material to any issue in the case other than Defendant's propensity. At various times, the State has asserted five different nonpropensity grounds for the relevance of the jail phone call: (1) habit; (2) "identity and modus operandi"; (3) Defendant's state of mind or intent; (4) "a potential motive for the killing"; and (5) consciousness of guilt. We address each of these arguments in turn.

{22} Contrary to the State's argument prior to trial, the jail phone call was not habit evidence. Even though the State has abandoned this argument on appeal, we nevertheless take the opportunity to clarify that the jail phone call could not have been habit evidence under Rule 11-406 NMRA. "Habit describes one's regular

12

response to a repeated specific situation. [It] is the person's regular practice of meeting a particular kind of situation with a specific type of conduct." *De La O v. Bimbo's Rest., Inc.*, 1976-NMCA-115, ¶ 11, 89 N.M. 800, 558 P.2d 69 (internal quotation marks and citation omitted). Thus, habit is a routine, specific behavior. For example,

> a person may be in the habit of bounding down a certain stairway two or three steps at a time, of patronizing a particular pub after each day's work, or of driving his automobile without using a seatbelt. The doing of the habitual act may become semi-automatic, as with a driver who invariably signals before changing lanes.

1 Kenneth S. Broun, et al., *McCormick on Evidence* § 195 (Robert P. Mosteller, ed., 8th ed. 2022). The "[s]pecificity" of habit "provides the key. If specific conduct usually results from specific stimuli," such that "the witness more likely than not acted in conformity with this virtually autonomic behavior," then the conduct is admissible as habit evidence. Bergman, *supra*, § 4:43; *see also* Rule 11-406(B) ("Habit . . . may be proved by . . . specific instances of conduct sufficient in number to warrant a finding that the habit existed.").

{23}    In this case, Defendant's statements revolve around actions he advised his son to take *in the future*. They do not disclose anything about Defendant's previous behavior, much less his routine and specific behavior—that is, that he regularly stabbed people in a "virtually autonomic" response to a specific set of stimuli.

Therefore, nothing in the jail phone call was probative of Defendant's habit, and his statements could not have been admitted under that theory.

{24} Similarly, the jail phone call was not evidence of identity or modus operandi. Like habit evidence, modus operandi is established by patterns of behavior. *See Modus Operandi*, *Black's Law Dictionary* (12th ed. 2024) (defining "modus operandi" as "[a] method of operating or a manner of procedure; esp., *a pattern of criminal behavior* so distinctive that investigators attribute it to the work of the same person" (emphasis added)). When a defendant's previous behavior "demonstrates a unique or distinct pattern easily attributable to one person," *State v. Martinez*, 2021-NMSC-002, ¶ 99, 478 P.3d 880 (quoting *State v. Peters*, 1997-NMCA-084, ¶ 14, 123 N.M. 667, 944 P.2d 896), that previous behavior can be introduced as modus operandi evidence to establish the defendant's identity.

{25} The relevance of the previous behavior "depends on the degree of similarity" between the previous behavior and the charged crime. *Peters*, 1997-NMCA-084, ¶ 14. For example, we have permitted evidence of two separate sexual assaults to show a defendant's modus operandi when the "assaults shared a marked number of similarities which could logically lead a jury to the inference that these two women were attacked by the same man," including that in each attack the attacker targeted elderly women in their homes at night, entered through a window, raped the victims

14

at knifepoint, tied their ankles and wrists, gagged them, covered their heads with a cloth, and asked them for their purses before leaving. *Id.* ¶ 15. "Taken together," we held that those shared characteristics were the "[d]efendant's 'signature' for evidentiary purposes which satisfies the stricter test of admissibility under Rule 11-404(B) for purposes of identity." *Peters*, 1997-NMCA-084, ¶ 20.

{26} The State argues that Defendant's statements are equivalent to the "signature" in *Peters* because Defendant "described [Victim's] *exact* manner of death," including "the same weapon and identical wounds." It is true that Defendant's advice to his son—including the admonition to use a knife to inflict multiple stab wounds to the throat—bears some similarity to the charged crime. But unlike the laundry list of unique aspects of the crimes in *Peters*, "[t]his list of characteristics is not idiosyncratic or even unusual." *State v. Beachum*, 1981-NMCA-089, ¶ 10, 96 N.M. 566, 632 P.2d 1204. "[F]or evidence to be admissible" to prove modus operandi, "the similarity required must rise above the level of characteristics common to many incidents of the crime; it must demonstrate a unique or distinct pattern easily attributable to one person." *Id.* ¶ 9. The use of a knife as a murder weapon is not unique: the most recently available nationwide crime data shows that knives are second only to guns as the weapon most often used in homicides. Fed. Bureau of Investigation, *Crime Data Explorer*, Expanded Homicide Offense Characteristics in

the U.S. https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/shr (last visited August 9, 2024). And it is not rare for knife attacks to result in a large number of injuries. *See*, *e.g.*, *State v. Smith*, 2016-NMSC-007, ¶ 22, 367 P.3d 420 (describing the deadly knife attack resulting in "ninety stab wounds over [the victim's] body"); *see also State v. Guerra*, 2012-NMSC-027, ¶ 29, 284 P.3d 1076 (discussing "overkill" murder where the victim was stabbed thirteen times); *State v. Duran*, 2006-NMSC-035, ¶ 3, 140 N.M. 94, 140 P.3d 515 (describing "the victim's death . . . from multiple stab wounds"). There is nothing particularly "unique or distinct" about the behavior that Defendant advocated in the jail phone call to his son. Certainly, it is not comparable to the multifaceted attacks that created the assailant's "signature" in *Peters*.

{27}     More crucially, Defendant's words are solely words, not deeds. The State points to nothing in our modus operandi caselaw to indicate that words alone—not in themselves criminal—can be sufficient to establish a modus operandi. The overwhelming majority of our modus operandi cases involve a comparison between completed courses of criminal conduct. *See*, *e.g.*, *Lovett*, 2012-NMSC-036, ¶ 39 ("*Peters* is about cross-admissibility of evidence when it suggests that *the perpetrator in one crime is the same as the perpetrator in another crime*, because the two crimes were committed with a common modus operandi."); *see also*, *e.g.*,

*id.* ¶ 40 (comparing evidentiary patterns across two murders); *Martinez*, 2021-NMSC-002, ¶¶ 97-99 (comparing evidentiary patterns between a drive-by shooting and charged homicides); *State v. Griffin*, 1993-NMSC-071, ¶ 11, 116 N.M. 689, 866 P.2d 1156 (comparing evidentiary patterns across two car thefts); *Beachum*, 1981-NMCA-089, ¶¶ 1, 5, 10 (comparing evidentiary patterns of previous rapes to charged aggravated burglary and criminal sexual contact). Absent any argument as to how words alone rather than behavior can establish a modus operandi, we cannot conclude that they did in this case. We hold that because Defendant's statements in the jail phone call did not show an evidentiary pattern of behavior, they were not probative of modus operandi and were not admissible as proof of identity.

{28}     We also find no support for the State's contention that the jail phone call was evidence of Defendant's state of mind or intent. The State does not elaborate on this argument other than to note that "Defendant explicitly contemplated repeatedly stabbing any person . . . in the throat in order to end their life if they did something he took issue with," and to quote Defendant's assertion that these statements were "'the State's most probative evidence of premeditated and deliberate murder in this case.'" These undeveloped assertions are insufficient for us to conclude that the statements in the jail phone call are relevant to establishing Defendant's intent. *See Serna*, 2013-NMSC-033, ¶ 17 (explaining that proponents of other acts evidence

17

must make a cogent argument for a nonpropensity use of the evidence beyond a rote "incantation of the illustrative exceptions" in Rule 11-404(B) (internal quotation marks and citation omitted)). A defendant's subsequent statements are only probative of criminal intent if they relate back to the defendant's mens rea prior to the commission of the crime. *Compare Duran*, 2006-NMSC-035, ¶¶ 8-9 (holding that the defendant's statement, "'I straight up murdered some bitch,'" was relevant to deliberate intent because it demonstrated animus toward the victim), *with State v. Garcia*, 1992-NMSC-048, ¶ 32, 114 N.M. 269, 837 P.2d 862 (holding that the defendant's remark after the killing that he would kill the victim "'again'" could not show his deliberate intent prior to the killing), *and State v. Slade*, 2014-NMCA-088, ¶ 28, 331 P.3d 930 (holding that the defendant's admission that he shot the victim "tells us nothing about [the d]efendant's state of mind *before* the shooting, which is the central inquiry of a crime based on premeditation"), *and State v. Taylor*, 2000-NMCA-072, ¶ 22, 129 N.M. 376, 8 P.3d 863 (stating that the defendant's admission that he shot the victim was not evidence of deliberate intent because "[w]e have no statements before the shooting that he wanted to kill [the victim] or wished her dead"). In this case, Defendant's statements are entirely future-oriented and make no reference to his state of mind on the date of the killing in question. We cannot conclude, therefore, that these statements are probative of Defendant's intent.

{29} The State's argument that the jail phone call was probative of Defendant's motive is similarly unsupported. The State argues that Defendant's advice to kill anyone who might touch, approach, or even look at his son, "suggests Defendant could have been motivated to stab [Victim] because [Victim] engaged in the relatively innocuous behaviors that Defendant apparently finds unacceptable and worthy of death." The State's suggestion that Defendant "could have been motivated" by Victim's behavior is entirely ungrounded in the evidence: no evidence was admitted as to anything Victim did after he voluntarily entered Defendant's truck. Nevertheless, the State asks us to infer that at some point thereafter, Victim's behavior provided a motive for Defendant to kill Victim, even though the State identifies neither Victim's behavior nor Defendant's motive. This is a call for "speculation, conjecture, or the piling of inference upon inference," which we will not do. *Adamson v. Highland Corp.*, 1969-NMCA-007, ¶ 15, 80 N.M. 4, 450 P.2d 442.

{30} In any event, Defendant's statements do not show any animus toward Victim and therefore are not probative of motive. Defendant's statements were broad generalizations applying equally to "anybody" and "everybody," with no reference or allusion to the specific victim in this case. From such general language, one could draw the forbidden propensity inference, but one cannot discern motive. Motive is

specific; it is generally based on "evidence that the defendant himself had a history of conflict with the victim." *Slade*, 2014-NMCA-088, ¶ 24; *see also* Broun, *supra*, § 190.5 (noting that, in the context of violent crimes, motive is established by evidence "evincing not merely a general disposition toward violence, but a virulent hostility toward a specific individual"). We have stated that motive in homicide cases involve "the relationship of the parties and the animus of the accused toward the deceased." *State v. Flores*, 2010-NMSC-002, ¶ 32, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted), *overruled on other grounds by Martinez*, 2021-NMSC-002, ¶ 87. While we recognize that there may be cases in which statements of animus against a group or class could be relevant to motive,[4] in this case Defendant's statements displayed animus toward, if anything, humanity at large. We are not prepared to conclude that evidence of general misanthropy is evidence of motive in a specific case. Therefore, nothing in the jail phone call was

---

[4]Statements of animus against a group or class could be relevant if the victim is a member of the group or class against whom the defendant expressed animus. *See*, *e.g.*, *State v. McDonald*, 1998-NMSC-034, ¶¶ 14-15, 126 N.M. 44, 966 P.2d 752 (holding that "anti-Hispanic animus" as shown by the defendant's "comments about the [Hispanic] victim and others could be put before the jury on the issue of motive"). "[W]hen the motive for a crime is racial [or other identity-based] hatred . . . , evidence of such hatred is relevant and admissible in spite of its potential prejudicial effect." *Id.* ¶ 13.

probative of Defendant's motive, and his statements could not have been admitted under that theory.

{31} We turn now to the State's final theory of admissibility, which is that the jail phone call was probative of consciousness of guilt. Although not expressly listed in Rule 11-404(B)(2), it has long been recognized that "consciousness of guilt . . . has independent relevance" and therefore "constitutes a permissible use of other acts or wrongs under Rule 11-404(B)." *Martinez*, 1999-NMSC-018, ¶ 29 (internal quotation marks and citation omitted). Plainly, the majority of the above-discussed statements in the jail phone call do not constitute consciousness-of-guilt evidence because they are future-oriented statements of advice rather than admissions of past wrongdoing. Thus, the State correctly focuses its consciousness-of-guilt argument on only a few statements in the phone call: "particularly Defendant's assurances that he would 'go down' and 'go to hell' for any stabbing deaths and that he was 'going to prison.'"

{32} Placed into context, we do not view Defendant's statement, "[a]nd I'll go down and go to hell for it," as an admission of guilt to the killing of Victim (or, as the State puts it, an admission of guilt "for any stabbing[] deaths"). "I'll go down and go to hell for it" came directly on the heels of Defendant "ordering" his son to repeatedly stab people as part of his duty as "the man of the house" who is charged with "protect[ing] everyone." The statement was immediately followed by more

21

advice in the same vein. Thus, the "it" for which Defendant expressed his willingness to "go down and go to hell" seemed to relate solely to the advice he was imparting to his son, which most people would find morally repugnant. If anything, Defendant was expressing his emphatic commitment to that unsavory advice, come what may. We do not understand that statement as an expression of guilt for the charged crime, as the context in which it was made was in the vein of general advice to his son as the man of the house, purely advisory, and future-oriented.

{33} Nevertheless, we agree with the State that the statement "Daddy's going to prison" could indicate consciousness of guilt, because it reasonably could be construed as an acknowledgment that Defendant committed a criminally culpable act for which he would be sentenced. *See, e.g., Commonwealth v. Velasquez*, 718 N.E.2d 398, 402 (Mass. App. Ct. 1999) (holding that defendant's remark that "he was going to jail for two years . . . can be taken as an expression of consciousness of guilt"); *see also People v. Jefferson*, 3 N.Y.S.3d 547, 549 (N.Y. App. Div. 2015) (holding that the defendant's statement "that he might be 'going to jail'" was admissible to prove consciousness of guilt).

{34} We hold that of all of the statements Defendant made in the jail phone call, it is only this latter statement—"Daddy's going to prison"—that has any permissible probative value because it tends to show Defendant's consciousness of guilt. All

22

other statements in the jail phone call are solely probative of Defendant's propensity for violence, which the jury cannot be permitted to consider under any circumstances. Rule 11-404(A). We next analyze whether the probative value of the jail phone call is outweighed by the danger of unfair prejudice under Rule 11-403.

**b.      The jail phone call was substantially more prejudicial than probative**

{35}      Having determined that all but one of the statements in the jail phone call were exclusively probative of Defendant's propensity for violence, which is a prohibited inference, we conclude that the limited probative value of that isolated statement does not overcome the propensity evidence contained within the jail phone call as a whole, thus rendering the unredacted phone call substantially more prejudicial than probative. *See Lovett*, 2012-NMSC-036, ¶ 49 ("Because we have already concluded that evidence of each murder was not offered for any permissible purpose, the inherent prejudicial effect of admitting evidence of prior bad acts necessarily outweighs the probative value of the evidence."). Because propensity evidence is strictly inadmissible under Rule 11-404(A), we have no difficulty concluding that the district court erred by admitting this evidence. *See State v. Gallegos*, 2007-NMSC-007, ¶ 21, 141 N.M. 185, 152 P.3d 828 (holding that propensity evidence "should be automatically excluded . . . because it is unfairly prejudicial as a matter of law"); *see also* Rule 11-103(D) NMRA ("To the extent practicable, the court must

conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means."). In light of the limited probative value of Defendant's single statement "Daddy's going to prison," the unredacted jail phone call as heard by the jury was undoubtedly substantially more prejudicial than probative.

{36} We determine whether this error rose to the level of plain error by inquiring next into the impact of the error on Defendant's rights and the jury's verdict. The error affected Defendant's substantial right to a fair trial and significantly affected the verdict.

{37} In this case, the jury heard Defendant's own voice and words instructing his son to commit wanton, extreme acts of violence against other human beings. These instructions would give rise to aversion and dismay in any reasonable person. The prosecutor discussed the jail phone call in the opening statement, played the call in its entirety during the presentation of evidence, then summarized and replayed the jail phone call during closing argument. Certainly, the prosecutor did not minimize this evidence, but placed it front and center for the jury's consideration. *See State v. Sosa*, 2009-NMSC-056, ¶¶ 29-32, 147 N.M. 351, 223 P.3d 348 (explaining in the context of prosecutorial misconduct that appellate courts consider the extent to which the jury is exposed in reviewing for error).

24

{38} We cannot overlook the power of this propensity evidence to sway the jury in this case. As the United States Supreme Court has noted, jurors are attentive to the whole cloth woven from individual strands of evidence:

> Evidence . . . has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. This persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them. . . . [T]he evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance.

*Old Chief v. U.S.*, 519 U.S. 172, 187 (1997). Particularly in this case, where the impermissible evidence comprised "'the State's most probative evidence of premeditated and deliberate murder'" by the State's own admission in quoting Defendant on appeal, we conclude that the propensity evidence contained in the jail phone call significantly impacted the jury's verdicts. Concomitantly, Defendant's right to a fair trial was compromised. Therefore, the admission of this evidence was plain error.

{39} The remedy for plain error is to vacate the convictions and remand to the district court. *See Lucero*, 1993-NMSC-064, ¶ 22 (reversing and remanding after determining that there had been plain error); *see also, e.g.*, *Paiz*, 1999-NMCA-104, ¶¶ 33-34 (same). To avoid violating double jeopardy, retrial is allowed on remand

25

only when the defendant's convictions were supported by substantial evidence. *State v. Consaul*, 2014-NMSC-030, ¶¶ 41-42, 332 P.3d 850; *State v. Cabezuela*, 2011-NMSC-041, ¶ 40, 150 N.M. 654, 265 P.3d 705. We therefore turn to whether Defendant's convictions were supported by substantial evidence in this case.

**B.      Retrial Is Warranted Because Defendant's Convictions Were Supported by Substantial Evidence**

{40}     Our standard of review for sufficiency of the evidence is highly deferential to the jury's verdict. We view the evidence

> in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. In particular, New Mexico appellate courts will not invade the jury's province as fact-finder by second guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury. So long as a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction, we will not upset a jury's conclusions.

*State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (text only) (citations omitted).

{41}     The jury instructions in this case provided that the jury could find Defendant guilty of first-degree murder if it found that Defendant killed Victim "with the

deliberate intention to take away the life" of Victim.[5] The findings that Defendant invited Victim into his truck, Victim's blood was found in Defendant's truck and on the sleeve of Defendant's jacket, and Victim was not seen alive again after being in Defendant's company constituted substantial evidence that Defendant killed Victim. *See Flores*, 2010-NMSC-002, ¶ 17 ("The law does not require testimony from a witness who personally saw Defendant at the very moment he actually stabbed his victim.").

{42}     The primary focus of Defendant's sufficiency challenge is not on the actus reus but the mens rea element of first-degree murder—deliberate intention—which, as the jury was instructed,

> may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh

---

[5]The Court does note that the State engages in roulette when only charging a defendant with first-degree murder without a step-down instruction to second-degree murder. *See State v. Villa*, 2004-NMSC-031, ¶ 14, 136 N.M. 367, 98 P.3d 1017 ("In this case the State and Defendant pursued an 'all-or-nothing' trial strategy, in which neither party requested instructions on any lesser-included offenses. . . . We believe that both parties are entitled to the benefits and should be liable for the risks of their respective trial strategies.")

and consider the question of killing and his reasons for and against such a choice.

UJI 14-201 NMRA.

{43} Defendant argues that there was insufficient evidence of deliberation, relying on a reinterpretation of each individual piece of evidence in a manner that could be consistent with Defendant's innocence. Defendant argues that the State presented no evidence of a motive; witness testimony indicated that Defendant was not aggressive towards Victim when Defendant invited him into his truck and that Victim "departed amicably" with Defendant; and Defendant's driving behavior—making several U-turns before picking up Victim—was "equally consistent with two friends meeting" as with deliberation before killing.

{44} However, "[t]his divide-and-conquer approach is not contemplated in appellate review for sufficiency of the evidence." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285. We do not "parse[] the testimony and view[] the verdict only in light of the probative value of individual pieces of evidence," nor do we "evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *Id.* (internal quotation marks and citation omitted). Instead, "we view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict." *Id.*

{45} Viewed in the light most favorable to the verdict, sufficient evidence supported the jury's finding that Defendant acted with deliberate intention when he killed Victim. The jury heard evidence that Defendant made several U-turns near Victim before picking him up; convinced Victim to get in Defendant's truck with an offer of food; drove Victim to another, unknown location; drew a knife on Victim and proceeded to stab him 24 times; dumped Victim's body in an alleyway; and Defendant's truck was sanded and the toolbox spray-painted. These facts shed light on Defendant's behavior before, during, and after the killing. From the totality of these facts, the jury could reasonably have inferred that Defendant killed Victim with the requisite mens rea.

{46} Defendant's behavior prior to the killing supports a reasonable inference that Defendant deliberately targeted Victim for murder, lured him into the truck on false pretenses, and transported him to an isolated location for the purpose of the murder that Defendant then committed. *See, e.g.*, *State v. Baca*, 1995-NMSC-045, ¶¶ 41-42, 120 N.M. 383, 902 P.2d 65 (inferring that the movement of a murder victim to a remote location is generally "for the purpose of facilitating the murder" and to ensure "that there are no witnesses to the murder"); *see also generally* 2 Wayne R. LaFave, *Substantive Crim. L.* § 14.7(a) (3d ed. 2023) (noting that "taking the prospective victim to a place where others are unlikely to intrude" can support an inference of

29

deliberation). The fact that Defendant did not behave aggressively towards Victim during the initial encounter is immaterial; criminal ends may be achieved by deception. *See*, *e.g.*, *State v. Ortega*, 1991-NMSC-084, ¶¶ 4, 53, 112 N.M. 554, 817 P.2d 1196 (affirming convictions where the defendant deceived the victims into accompanying him to a remote area where he robbed and murdered them), *abrogated on other grounds as recognized by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683; *State v. Sokolic*, 660 S.W.3d 54, 58-59 (Mo. Ct. App. 2023) ("A reasonable jury could infer [the defendant's] deception is consistent with a deliberate plan to induce [the victim] to drive behind the barn so he could more readily conceal the attack.").

{47} The sheer brutality of the attack likewise supports a reasonable inference that Defendant deliberated, particularly when accompanied by other evidence tending to show deliberation. *See*, *e.g.*, *State v. Thomas*, 2016-NMSC-024, ¶ 41, 376 P.3d 184 ("[A] large number of wounds . . . can indicate deliberation. The fact that the number of wounds could instead indicate impulsivity, as Defendant argues, does not mean that the jury was required to interpret them that way."); *see also Guerra*, 2012-NMSC-027, ¶ 29 (concluding that thirteen stab wounds, along with evidence that the defendant rendered the victim helpless before attacking him and later expressed no remorse, constituted sufficient evidence of premeditation); *Duran*, 2006-NMSC-

035, ¶ 8 ("[A] reasonable jury could have believed the [d]efendant had the deliberate intent to kill the victim by inferring from the physical evidence of a prolonged struggle and multiple stab wounds."); *Sokolic*, 660 S.W.3d at 58 ("Deliberation can be readily inferred from the 27 stab wounds to a vital part of the body inflicted by a deadly weapon." (text only) (citation omitted)).

{48} In addition, evidence of Defendant's behavior after the killing, while perhaps not establishing deliberation by itself, can show consciousness of guilt which could be considered in tandem with the evidence of deliberation prior to and during the killing. *See, e.g., Flores*, 2010-NMSC-002, ¶ 23 ("Not only may [a d]efendant's acts before and during the crime provide evidence of intent, evidence of flight or an attempt to deceive the police may prove consciousness of guilt. (internal quotation marks omitted)). In this case, after Defendant killed Victim, Defendant dumped Victim's body in an alleyway, sanded down his truck, and spray-painted his toolbox in acts that could be seen as calculated.[6]

{49} While any of these factors standing alone might not permit the inference of deliberation beyond a reasonable doubt, they did not stand alone in this case. In

---

[6]These latter two facts also provide sufficient evidence for Defendant's tampering with evidence conviction, in which the jury found that Defendant (1) "destroyed, changed, hid, [or] fabricated the pickup truck" (2) in order "to prevent [his] apprehension, prosecution, or conviction . . . for the crime of murder."

31

combination, the jury could have reasonably inferred from the totality of these circumstances that Defendant acted with deliberate intention when he killed Victim. *See Flores*, 2010-NMSC-002, ¶¶ 21-24 (analyzing evidence of Defendant's deliberation through the lens of "[t]he totality of the evidence"). Because substantial evidence supported Defendant's convictions, retrial is not barred by double jeopardy. *Consaul*, 2014-NMSC-030, ¶ 41.

## III. CONCLUSION

{50} The district court committed plain error by allowing the jury to hear evidence that was relevant only to Defendant's propensity for violence. This evidence was highly inflammatory and deprived Defendant of a fair trial. We therefore vacate Defendant's convictions and remand this case for proceedings consistent with this opinion.

{51} **IT IS SO ORDERED.**

_____
C. SHANNON BACON, Justice

**WE CONCUR:**

_____
DAVID K. THOMSON, Chief Justice

_____
MICHAEL E. VIGIL, Justice

_____
JULIE J. VARGAS, Justice

_____
BRIANA H. ZAMORA, Justice